**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO.: 16-80251-CV-MIDDLEBROOKS/BRANNON**

CHANDA MICHAELA BROWN,

      Plaintiff,

v.

FLORIDA ATLANTIC UNIVERSITY,
BOARD OF TRUSTEES

      Defendant.

_____/

**<u>SECOND AMENDED COMPLAINT</u>**

      Plaintiff, CHANDA MICHAELA BROWN ("Plaintiff" or "Brown") sues Defendant, FLORIDA ATLANTIC UNIVERSITY, BOARD OF TRUSTEES ("FAU"), and alleges as follows:

**<u>NATURE OF CLAIMS</u>**

      1.    This is an action for damages and equitable relief for intentional gender discrimination and disability discrimination during her employment at FAU, and for retaliation for making complaints of discrimination prior to her termination with FAU in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 *et seq*., the Rehabilitation Act of 1973, 29 U.S.C. §794.

**<u>PARTIES, JURISDICTION AND VENUE</u>**

      2.    Brown is a 41-year-old female resident of Broward County, Florida.  Brown was formerly employed by FAU as a Coordinator to Academic Support and Advisor in Palm Beach County, Florida.

3.     FAU is a public four-year university of the Florida University System, with its principal place of business in Boca Raton, Florida. FAU receives federal financial assistance by virtue of accepting federal student financial aid, and upon information and belief, by receiving federal grant monies for other programs and services at FAU. As to Plaintiff's claims, FAU was at all times material Brown's "employer" as envisioned by Title VII and the Rehabilitation Act.

4.     This Court has jurisdiction over Brown's claims pursuant to 28 U.S.C. §1331 because Plaintiff seeks to recover damages under Title VII and the Rehabilitation Act.

5.     Venue is proper in the United States District Court for the Southern District of Florida, West Palm Division, since it is where the claim arose and where FAU maintains the office in which Brown was employed.

## GENERAL ALLEGATIONS

6.     Brown began working for FAU on July 28, 2014 as a Coordinator, Academic Support Services and Advisor, in the College of Engineering and Computer Sciences under the grant funded initiative known as The Computer Accelerated Pipeline to Unlock Regional Excellence ("CAPTURE"). The CAPTURE program is a collaborative effort between FAU, Broward College, and Palm Beach State College to identify appropriate courses that will count towards an AA or an AS degree, and then transfer to either a Bachelor of Science in Computer Science (BSCS) or a Bachelor of Science in Computer Engineering (BSCE) degree program at FAU.

7.     At all times material hereto, Brown had ADHD, a learning disability and anxiety disorder that qualified as a disability under the Rehabilitation Act, because these impairments substantially limited her major life activities such as concentration, thinking, learning, as well as her emotions and ability to manage stress.  Brown was first diagnosed with ADHD and learning

DEUTSCH ROTBART & ASSOCIATES, P.A.
BOCA RATON • FORT LAUDERDALE • MIAMI

disability in 2001, and she retested in 2009, which revealed that the disabilities were unchanged since her initial diagnosis.

8.     Upon her employment with FAU, Brown initially reported to Dr. Lofton Bullard, Director of Engineering Student Advising, who in turn is directly supervised by Dr. Ali Zilouchian, Associate Dean of Engineering.

9.     Almost immediately, Dr. Bullard began harassing Brown by making inappropriate comments to her as she was his subordinate.  Dr. Bullard told Brown that he thought she was Lebanese and that was why he had selected her as a candidate for the position even though, according to Dr. Bullard, "there were candidates with better credentials and experience."  Dr. Bullard told Brown that there was another advisor, Jessica Brynes that he wanted for the position.

10.    After about two weeks in the position, Brown became painfully aware of the reason why Dr. Bullard wanted to select Ms. Brynes. It was obvious that Dr. Bullard and Ms. Brynes were somehow personally or romantically involved even though they were in a supervisor and subordinate relationship. Brown witnessed them leaving the office together frequently.  Ms. Brynes would sit next to Dr. Bullard behind his desk and wore revealing clothing.  Dr. Bullard went so far as to ask Dr. Zilouchian whether Ms. Brynes could join the CAPTURE project and essentially perform the position that Brown was hired to perform.  Dr. Zilouchian declined Dr. Bullard's request and clearly indicated to him that Brown was the "face of CAPTURE."

11.    Thereafter, Dr. Bullard mocked Brown by making statements such as "since you are the face of CAPTURE," you should be able to do the job without any training.  When Brown did ask for training assistance, Dr. Bullard told her "he was too busy." Nonetheless, Dr. Bullard

DEUTSCH ROTBART & ASSOCIATES, P.A.
BOCA RATON • FORT LAUDERDALE • MIAMI

trained Ms. Brynes on the same procedures that Brown requested to be trained on because of his bias for Ms. Brynes as opposed to Brown.

12.     Dr. Bullard also intimidated Brown.  For example, after leaving for the day and locking her office, Dr. Bullard would unlock her office and intentionally place piles of work on her desk.  Also, while giving her instructions on assignments, he postured himself close by and propped his feet on her desk.  Brown felt very intimidated by his posturing, his size and tone of voice.

13.     On August 20, 2014, Dr. Bullard yelled at Brown while she was working on a report for which she was accountable.  Unbeknownst to Brown at the time, Dr. Bullard gave the report assignment to Ms. Brynes even though it was Brown's responsibility.  Upon learning that Dr. Bullard had given the report to Ms. Brynes for completion, Brown indicated that she was accountable for the report and that she had it nearly completed.  Dr. Bullard again yelled at her. She then asked him not to yell at her and not to take her work away.

14.     That same day, Dr. Bullard demanded in an email that Brown prepare a developmental implementation plan and a mentor report that were both to be completed by the end of the day.  Dr. Bullard copied Dr. Zilouchian on the email in an effort to place Brown in a negative light with Dr. Zilouchian. Brown worked feverishly to complete the documents because she feared Dr. Bullard's power and efforts to undermine her ability.

15.     After August 20, 2014, Dr. Bullard stopped responding to Brown and avoided talking to her.  In fact, he referred all of her questions and requests for instructions or assistance to Teresa Perez, the Assistant Director.  Dr. Bullard specifically told her to go to Ms. Perez for everything.  Indeed, he began having private meetings with Ms. Perez, who would then relay to Brown any tasks he wanted her to complete.

16.     On September 10, 2014, Brown consulted with Lynn Asseff, Director of Operations of Engineering and Computer Science.  Brown told her that she perceived Dr. Bullard was treating her disparately and harassing her. Dr. Bullard had prior complaints of harassment and disparate treatment based on gender, as Ms. Asseff stated to Brown that she thought "his behavior had improved since he had been spoken to in the past by the administration."  Ms. Asseff also confirmed that Dr. Bullard was in a relationship with Ms. Brynes, his subordinate employee and that she even stated to Brown, "Is it that obvious?"  Ms. Asseff indicated that she would report Brown's complaints to Dr. Zilouchian and Dean Mohammad Ilyas.

17.     Dean Ilyas and Dr. Zilouchian met with Brown on or around September 13th to September 16th, 2014 regarding her concerns about Dr. Bullard's behavior.  Brown told them that she did not want to lose her job for reporting Dr. Bullard.  Dean Ilyas told her that Dr. Bullard's conduct was wrong and that he had to investigate the matter.

18.     At that time, Dean Ilyas also interviewed Stephanie Gordon, another female advisor. Dean Ilyas learned that Ms. Gordon had previously reported Dr. Bullard to the department administration for sexual harassment and that she had received an unfavorable job evaluation from Dr. Bullard subsequent to her sexual harassment complaint.  Upon information and belief, Dean Ilyas amended her job evaluation.

19.     Despite her complaint to Dean Ilyas, Dr. Bullard continued to harass and intimidate Brown.  On September 17, 2014, Brown emailed Dean Ilyas and asked him to "please help her."  On or about September 20th and September 24th, Dr. Zilouchian told her that she would no longer report to Dr. Bullard, rather she would report to Dr. Zilouchian.

20.     However, Dr. Bullard continued to find ways to intimidate, harass and retaliate against Brown.  For example, he refused to provide physical space for Brown's mentors to tutor

DEUTSCH ROTBART & ASSOCIATES, P.A.

BOCA RATON • FORT LAUDERDALE • MIAMI

their students.  On October 30, 2014, Dr. Bullard refused assistance to a student simply because the student had an appointment with Brown. To Brown's knowledge, the student never received any assistance from Dr. Bullard.

21.     On another occasion, on November 5, 2014, at an Open House breakout session, Dr. Bullard and Ms. Brynes represented that Ms. Brynes was the CAPTURE representative that students should work with rather than Brown.

22.     On November 10, 2014, Dr. Bullard refused to allow Brown to attend a routine advisor meeting by conference call.  Dr. Zilouchian interceded after Brown brought this to his attention and allowed Brown to attend by conference call by speakerphone.  However, Dr. Bullard retaliated against Brown by telling Dr. Zilouchian during the meeting that Brown was violating FERPA by not being physically present for the meeting. On November 12, 2014, Dr. Bullard questioned Dr. Zilouchian about Brown's attendance at college fairs and outreach days, insinuating that Brown was not where she purported to be in an effort to cast Brown in a negative light with Dr. Zilouchian.

23.     On November 18, 2014, Brown emailed her marketing outreach locations and relevant staff with the dates and times that she would be out of the office for outreach.  That same day, she met with Dr. Zilouchian and told him of her continued concerns with Dr. Bullard based on his ongoing conduct stated in the above paragraphs. Dr. Zilouchian admitted that he had not even spoken to Dr. Bullard about his behavior and also told Brown that it was she who was to blame for the problems.

24.     Between December 5th through December 8th, 2014, Brown complained again to Ms. Asseff about the ongoing harassment and retaliatory conduct.  At that time, she also asked her what the protocol was to take a medical leave for a surgical procedure that required a two to

three-week recovery time.  Brown also conveyed to Ms. Asseff that she was continuing to suffer both physiological and emotional distress from the hostile work environment that Dr. Bullard was perpetuating.  Ms. Asseff assured Brown that she would speak to both Dr. Zilouchian and Dr. Ilyas about her complaints concerning Dr. Bullard.

25.     On December 9, 2014, Dr. Zilouchian met with all of the Advisors, at which time Brown directly confronted the issue with him and told him that Dr. Bullard was a bully and that all of the women in the Department feared him with the exception of Ms. Brynes with whom he had a personal relationship.  Another female advisor, Jessica Lewis-Hibberd, suggested that the female Advisors send an anonymous letter to Dr. Zilouchian if they did not feel comfortable openly discussing their issues with Dr. Bullard's behavior.  In response, Dr. Zilouchian stated that he would "not tolerate accusations against Dr. Bullard" and that each advisor would be subjected to meeting with Dr. Zilouchian independently to allegedly investigate the issues.

26.     On the same day, Brown learned that there was a CAPTURE meeting; however, Dr. Bullard specifically told Brown that the meeting was "not for her" to attend even though she was the CAPTURE lead representative.

27.     On December 10, 2014, Brown made a formal complaint to Human Resources and met with Donna Newman, the Human Resources Manager. While Brown was informing Ms. Newman of the circumstances of her matter and ongoing issues with Dr. Bullard, and that in light of how her supervisors were failing to respond to the issues that she was genuinely afraid to meet with Dr. Zilouchian and Dean Ilyas alone, another Human Resources representative, Robin Kabat, Associate Director was meeting with Dr. Zilouchian and Dean Illyas. Ms. Newman advised Brown that Ms. Kabat was her supervisor. Ms. Newman then walked Brown to the Engineering Department where she was to meet with Dean Ilyas.  Ms. Kabat stepped out of her

meeting with Dr. Zilouchian and Dean Ilyas and told Ms. Newman not to attend the meeting and so she left Brown to walk into the meeting alone. During Brown's meeting with Dean Ilyas and Dr. Zilouchian, Brown complained that Dr. Bullard was still harassing her even though she did not directly report to him at that time.  Brown stated that she did not understand how they could continue to allow Dr. Bullard to abuse women when they had prior knowledge of his abuse and harassing conduct; and she further complained that the hostile work environment had worsened notwithstanding that she no longer reported to him, as he was clearly acting retaliatory towards her.  The end result of this meeting with Dr. Zilouchian and Dean Ilyas was that Brown would meet with Human Resources again and further discuss the issues.

28.     Later that same day, Brown was scheduled to meet with a prospective CAPTURE candidate.  Brown needed a clarification about the student's scholarship application and went to see Dr. Bullard.  Dr. Bullard refused to talk to her and ultimately closed his office door right in Brown's face as she was standing right in front of the door.

29.     Shortly thereafter, Ms. Newman called to set a meeting with Brown for the following Tuesday.  At that time, Brown advised Ms. Newman about the incident wherein Dr. Bullard literally had just shut the door in her face.  On the following Tuesday, Brown provided Ms. Newman a report of the harassment and intimidation that she continued to suffer from Dr. Bullard and asked to be moved to another floor.  Ms. Newman said that she would look at the report "when she could."   Ms. Newman also advised Brown to contact FAU's Employee Assistance Program.

30.     On December 18, 2014, Dean Ilyas emailed the entire Advisor team stating that the Advisors' concerns would be evaluated and that the assessment would be shared after the holidays.

DEUTSCH ROTBART & ASSOCIATES, P.A.

BOCA RATON • FORT LAUDERDALE • MIAMI

31.     On January 6, 2015, Sylvanna Fahenstock, on behalf of Dr. Zilouchian, informed Brown that she would no longer be included in CAPTURE meetings going forward.  On January 7, 2015, Dr. Zilouchian asked Brown for her completed scholarship applications for CAPTURE students.  Brown responded that she would give them to him the following day, as she needed clarification for two of the students' applications.

32.     On January 8, 2015, Brown learned that Ms. Brynes was working on a CAPTURE report for Dr. Bullard.  Brown saw Dr. Zilouchian, who told her to meet with him later in the day.  Brown went to Dr. Zilouchian's office for the meeting and brought him the scholarship applications as promised.  When Brown arrived for the meeting, she learned that Ms. Kabat was also in Dr. Zilouchian's office. Brown asked why Ms. Kabat was present.  Dr. Zilouchian began telling Brown that she was the problem, that she was making false accusations and spreading rumors about Dr. Bullard.  Dr. Zilouchian also accused Brown of not following his direction about the scholarship applications because the applications did not equate to the number of students. Dr. Zilouchian was either mistakenly or purposely misinformed about the scholarship process because certain scholarships were a combination of hard copy from her outreach (i.e. from fairs and visits) and not solely online applications. Brown began crying during the meeting and was upset by the incredulousness allegations that were being turned against her. Brown was extremely and understandably uncomfortable in this meeting.

33.      Ms. Kabat refused to allow Brown to discuss her allegations about Dr. Bullard and simply agreed with Dr. Zilouchian's assessment.  Ms. Kabat was very harsh to Brown and exhibited no neutrality in the meeting. Brown was overwhelmed and emotionally upset.  Ms. Kabat rudely told her "she should be quiet." Despite the fact that Brown had never been disciplined, Dr. Zilouchian also began informing Brown about mistakes in a recent report, and

that he did not hire Brown to make mistakes. The meeting ended with Dr. Zilouchian requesting the scholarship applications electronically.

34.     After the above described meeting, a co-worker of Brown, Stephanie Gordon offered to assist her with scanning the scholarship applications because Brown was so upset, but Brown refused and sent the requested documents to both Dr. Zilouchian and Ms. Kabat.  Even though Brown had just emailed the scholarship applications to Dr. Zilouchian, he then sent her another email requesting the very same documents that she had already sent to him.  Another employee, Jessica Lewis-Heberd offered to drive Brown home because Brown was so emotionally distraught by Ms. Kabat and Dr. Zilouchian's conduct.

35.     After the January 8, 2015 meeting with Dr. Zilouchian and Ms. Kabat, Brown continued to be severely emotionally distraught knowing that FAU, through its agents were not doing anything to remedy the ongoing treatment and retaliation towards Brown.

36.     On Friday, January 9, 2015, Brown initially went to work and submitted a summary of her performance, which Dr. Zilouchian had requested in the meeting the previous day.  However, Brown was emotionally upset the previous evening and was afraid to go to work. Upon going to work, Brown began having anxiety and panic attacks, and she ultimately left work to go to the emergency room.  She informed Dr. Zilouchian that she went to the emergency room, and followed up with her own physician on Monday, January 12, 2015.

37.     Additionally, on January 9, 2015, Brown emailed Ms. Kabat's supervisor, David Tomiano and advised him of the situation with Dr. Bullard, the retaliatory meeting with Dr. Zilouchian and Ms. Kabat, and she requested a meeting with him. Mr. Tomiano never responded.

38.     On January 10, 2015, Brown was treated at the emergency room for palpitations and anxiety. Brown's mother emailed Dr. Zilouchian that Brown would be out of work and had

DEUTSCH ROTBART & ASSOCIATES, P.A.

BOCA RATON  •  FORT LAUDERDALE  •  MIAMI

seen her doctor, and that Brown was diagnosed with work related anxiety and palpitations. Dr. Zilouchian forwarded this email to Dr. Ilyas. Brown saw her own physician on Monday, January 12, 2015 and was advised that she should stay out of work until January 14, 2015.

39.    On or about January 11, 2015, Brown also contacted Paula Behul, Chair of FAU's Council on Equal Opportunity & Diversity to make yet another complaint about Dr. Bullard and his retaliatory conduct as well as the retaliation that she was experiencing from Dr. Zilouchian and Ms. Kabat.  At that time, she also requested a reasonable accommodation for her anxiety and ADHD learning disability.

40.    On or about January 12, 2015, Brown delivered a doctor's note to Dr. Zilouchian and Ms. Asseff indicating her return to work date.

41.    Brown met with Ms. Behul and Ed Rowe of the Office on Disabilities on January 13, 2015. Brown discussed her anxiety, ADHD, and learning disability to Ms. Behul and Mr. Rowe. On the same day, Brown sent Ms. Behul via email an evaluation of her ADHD and learning disability from 2009. Ms. Behul provided Brown FAU's discrimination complaint form and a request for reasonable accommodations form at this meeting.  Ms. Behul told her that she would be protected from retaliation during the investigation of her allegations and that her disability qualified for protection under the ADA.  One of the suggested accommodations was a job transfer. Ms. Behul indicated that she would work to find Brown another position out of the Department.

42.    After the January 13, 2015 meeting with Ms. Behul, Dr. Zilouchian asked Brown to meet with him on January 16, 2015 in their conference room instead of the routine meetings that occurred in his office.  Brown asked him why this meeting was scheduled, but he did not respond to her question. From January 14th and continuing on until her termination, Brown's

duties were simply taken away from her. Other Advisors were working on the CAPTURE project and she was taken out of the loop on everything related to her job. She was not advised of an Open House at Palm Beach State College that was scheduled for January 16, 2015, nor was she asked to represent the CAPTURE project at that Open House even though that was one of her job duties.

43.     On January 14, 2015, Brown submitted her written request for a reasonable accommodation in which her physician indicated that she needed to have structured, clear and precise goals, objectives and direction, and that she should not work over regular hours, and she should also have a structured work environment. As well, she submitted FAU's discrimination complaint form to Mr. Rowe and Ms. Behul, who were with the Equal Opportunity Programs office ("EOP"). Evidently, on the same day, Ms. Behul, Ms. Kabat and Mr. Rowe met regarding Brown.

44.     Ms. Behul advised Brown that she would not need to attend the meeting with Dr. Zilouchian on January 16, 2015. However, on the same day, Dr. Zilouchian asked to reschedule this meeting for January 20, 2015; and once again, he refused to tell Brown why this meeting was necessary. On January 20, 2015, Ms. Behul informed Brown that she would not attend this operational meeting with Brown even though Brown was very apprehensive and anxious about attending a meeting where the purpose of the meeting was not even explained to her.

45.     Brown came back to work from January 15th to January 20th, 2015.

46.     On January 19, 2015, Brown again contacted Ms. Kabat's supervisor, Mr. Tomiano a second time and spoke with his assistant, Allen Chie-For. Ms. Chie-For advised Brown that Mr. Tomiano was aware of her email and would let him know that she had called. Nonetheless, Mr. Tomiano never responded to Brown, nor did he return her call.

47.     Brown saw her doctor again on January 19th and January 21st, 2015 and was placed on a second medical leave from January 21st through January 26th, 2015[1] for both an upper respiratory issue as well as anxiety that she was suffering as a result of what she reasonably believed was a hostile work environment as described above.  Brown provided her doctor's notes to both Janet Eagan, FAU's representative for benefits and leave time and Ms. Asseff.

48.     On January 21, 2015, during Brown's medical leave, Dean Ilyas sent a letter to Brown terminating her employment effective the same day alleging that Brown had been "unprofessional, rude and insubordinate" in the January 8th meeting with Dr. Zilouchian and Ms. Kabat.  The letter also purported to give Brown one (1) month to work from home, as FAU regulation required one (1) month of notice before ending an appointment to the position. Brown did not receive the letter until January 23, 2015 because it was sent to the wrong address. On January 23, 2015, Ms. Asseff emailed the letter to Brown's personal email address. As of January 23, 2015, Brown's access to FAU email was cutoff.

49.     On April 15, 2015, FAU Equal Opportunity Programs Office completed its investigation of Brown's complaint. The investigation concluded that the College of Engineering failed to promptly refer Brown's allegations of discrimination to the FAU Equal Opportunity Programs Office.  The investigation also concluded that there had been a prior complaint against Dr. Bullard, which precipitated FAU to require him to attend additional Anti-Discrimination and Anti-Harassment training since this was his first supervisory position at FAU.

50.     FAU's EOP office investigation also concluded that Brown's belief that Dr. Bullard created a hostile work environment based on gender was objectively reasonable and that

---

[1] Brown also had a surgery that was scheduled to take place on January 26, 2015, unrelated to her claims in this case which FAU had preapproved her medical leave in December 2014.

DEUTSCH ROTBART & ASSOCIATES, P.A.

BOCA RATON • FORT LAUDERDALE • MIAMI

she engaged in protected conduct when she complained.

51.     Brown alleges that she was not provided reasonable accommodations for her disabilities, and that she was terminated in retaliation for making complaints about a hostile work environment. FAU's reasons for terminating Brown were clearly pretexts for disability discrimination and retaliation.

52.     Brown has retained the undersigned attorney and has agreed to pay a reasonable fee in return for her services.

<u>CONDITIONS PRECEDENT</u>

53.     On or about April 14, 2015, Brown filed her discrimination and retaliation allegations with the Equal Employment Opportunity Commission ("EEOC") alleging gender discrimination, disability discrimination, and for retaliation for making complaints of discrimination in violation of Title VII. A copy of Brown's Charge of Discrimination is attached hereto as **Exhibit "A"**.  On February 4, 2016, the U.S. Department of Justice issued Brown a Notice of Right to Sue. A copy of Brown's Notice of Right to Sue is attached hereto as **Exhibit "B"**.  Brown's Complaint is being timely brought within ninety (90) days of receiving her Notice of Right to Sue.

<u>COUNT I</u>
**DISABILITY DISCRIMINATION
UNDER THE REHABILITATION ACT**

54.     Plaintiff re-alleges and incorporates by reference as if fully set forth, the allegations in paragraphs 1 through 53.

55.     FAU is a program or activity covered by the Rehabilitation Act, 29 U.S.C. § 794 (b)(2)(A), because it is a university.

56.      FAU receives federal financial assistance because its' students receive federal

DEUTSCH ROTBART & ASSOCIATES, P.A.
BOCA RATON • FORT LAUDERDALE • MIAMI

financial aid and FAU benefits from this federal financial assistance.  Upon information and belief, FAU receives other federal grant monies and other federal financial assistance, directly or indirectly, for other services and programs at FAU.

57.     Brown is and/or was at the time of her employment with FAU a disabled/handicapped individual as defined in 29 U.S.C. §705. Brown was a qualified disabled individual because her impairments ADHD, learning disability and anxiety affected her thinking, concentration, learning, ability to see thing as other non-learning disabled individuals would see things, and her emotional responses to situations and to others.

58.     FAU's conduct as described above is such that it engaged in unlawful employment practices and discriminated against Brown by terminating her employment on account of her known disability, and/or because FAU regarded her as having a disability, and/or because of Brown's record of having a disability in violation of the Rehabilitation Act.

59.     FAU also refused to accommodate Brown's request for reasonable accommodation on the basis of her disability in violation of the Rehabilitation Act.

60.     As a result of FAU's unlawful discrimination, Brown has suffered and continues to suffer damages.

WHEREFORE, Plaintiff prays that this Honorable Court will enter an Order:

A.      Preliminarily and permanently enjoining and restraining Defendant from engaging in acts of discrimination against Plaintiff;

B.      Granting such other and further relief as is just including, but not limited to reinstatement and any and all monetary damages, back pay, front pay, wage and benefit losses, and other relief as this honorable Court deems appropriate under the circumstances; and

C.      Granting Plaintiff Brown her costs and a reasonable award of attorney's

DEUTSCH ROTBART & ASSOCIATES, P.A.
BOCA RATON • FORT LAUDERDALE • MIAMI

fees.

## COUNT II
## TITLE VII - RETALIATION CLAIM

61.     Plaintiff re-alleges and incorporates by reference as if fully set forth, the allegations in paragraphs 1 through 53.

62.     Brown objectively reasonably believed that Dr. Bullard's conduct was creating a hostile work environment because she was aware of prior complaints against Dr. Bullard for sex harassment and because she believed that his favoritism for Ms. Byrnes was based on his inappropriate romantic involvement with a subordinate employee and the other female Advisors in the department were treated disparately because of the relationship. Brown thus engaged in protected conduct when she complained to her superiors about gender discrimination based on a hostile work environment and retaliation she suffered after she complained to FAU's officials. Indeed, FAU admitted she engaged in protected conduct.

63.     In close proximity to Brown's protected conduct, FAU by and through its managers and agents retaliated against Brown by stripping her of her job duties, ostracizing her from meetings, withholding assistance with her position, belittling her and eventually terminating Brown's employment without a legitimate reason for doing so.

64.     Brown has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and her action for permanent injunction and other relief is her only means of securing adequate relief.  Brown is suffering and will continue to suffer irreparable injury from FAU's acts.

65.     As a direct, natural, proximate and foreseeable result of the actions of Defendant, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

66.     FAU's acts were intentional and violated Brown's right under Title VII.

WHEREFORE, Plaintiff prays that this Honorable Court will enter an Order:

A.     Preliminarily and permanently enjoining and restraining Defendant from engaging in acts of retaliation against Plaintiff;

B.     Granting such other and further relief as is just including, but not limited to any and all monetary damages, compensatory damages, wage and benefit losses, and other relief as this honorable Court deems appropriate under the circumstances; and

C.     Granting Plaintiff Brown her costs and a reasonable award of attorney's fees pursuant to Title VII.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff, CHANDA MICHAELA BROWN demands trial by jury for all issues so triable under federal and state law.

DATED this **5th day of May, 2016.**

Respectfully submitted,

DEUTSCH ROTBART & ASSOCIATES, P.A.
Counsel for CHANDA MICHAELA BROWN
4755 Technology Way, Suite 106
Boca Raton, Florida 33431
Telephone:  561.361.8010
Facsimile:  561.361.8086
Email:  edrotbart@dralawfirm.com

BY:  s/Erika Deutsch Rotbart
        Erika Deutsch Rotbart, Esq.
        Florida Bar No.: 0047686

Page 17 of 18

DEUTSCH ROTBART & ASSOCIATES, P.A.
BOCA RATON • FORT LAUDERDALE • MIAMI

## <u>CERTIFICATE OF SERVICE</u>

I **HEREBY CERTIFY** that on this **5th day of May, 2016**, I served *Plaintiff's Second Amended Complaint* via email upon all counsel of record identified on the attached Service List.

DEUTSCH ROTBART & ASSOCIATES, P.A.
Counsel for Plaintiff


BY:   <u>s/Erika Deutsch Rotbart</u>
Erika Deutsch Rotbart, Esq.
Florida Bar No.: 0047686

### <u>SERVICE LIST</u>
*Chanda M. Brown v. Florida Atlantic University*
**Case No.: 16-80251-CV-MIDDLEBROOKS/BRANNON**

Erika Deutsch Rotbart, Esq.
Deutsch Rotbart & Associates, P.A.
4755 Technology Way, Suite 106
Boca Raton, FL 33431
Telephone:  561.361.8010
Facsimile:    561.361.8086
Primary E-mail: edrotbart@dralawfirm.com
Secondary E-mail: dralaw@dralawfirm.com
Counsel for Plaintiff

Jeffrey A. Rubinton, Esq.
Dawn Marshall, Esq.
Rubinton & Associates, P.A.
Bank of America Building
3801 Hollywood Blvd., Suite 300
Hollywood, FL 33021
Telephone: 954.251.5500
Facsimile:  954.251.5501
E-mail: jrubinton@rubintonlaw.com
        dmarshall@rubintonlaw.com
        estfleur@rubintonlaw.com
Counsel for Defendant

DEUTSCH ROTBART & ASSOCIATES, P.A.
BOCA RATON • FORT LAUDERDALE • MIAMI

| **CHARGE OF DISCRIMINATION**<br><br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Statement and other information before completing this form. | Charge Presented to:<br><br>☐ FEPA<br><br>☒ EEOC | Agency(ies) Charge No(s): |
|---|---|---|

| Florida Commission on Human Relations<br>*State or local Agency, if any* | and EEOC | |
|---|---|---|

| Name *(Indicate Mr., Ms. or Mrs.)*<br>Chanda Michaela Brown | Mobile Telephone No. *(Incl Area Code)*<br>(954) 496-0248 | Date of Birth<br>8/11/1974 |
|---|---|---|

| Street Address<br>3010 N. Course Drive, Apt. #710, Florida 33069 | City, State, and ZIP Code | |
|---|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than one, list below.)*

| Name Florida Atlantic University | No. of Employees, Members<br>15+ | Phone No. (Include Area Code)<br>(561) 297-3450 |
|---|---|---|

| Street Address<br>777 Glades Road, Administration Bldg, Room 339, Boca Raton, FL  33431 | City, State and ZIP Code | County<br>Palm Beach |
|---|---|---|

DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN

☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ OTHER *(Specify)*

DATE DISCRIMINATION TOOK PLACE

Earliest: August 20, 2014    Latest: January 23, 2015

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s))*

1. I am a 40-year-old female with an ADHD learning disability and anxiety. I became employed at Florida Atlantic University ("FAU") on July 28, 2014 under a grant known as CAPTURE and my title was Coordinator to Academic Support and Advisor. Initially, my immediate supervisor was Dr. Lofton Bullard, Director of Engineering Student Advising. Dr. Bullard reported to Dr. Ali Zilouchian, Associate Dean of Engineering.

2. From the beginning of my employment, Dr. Bullard was harassing, bullying and treated me disparately because of my gender. Other female advisors in the department felt that Dr. Bullard mistreated them. For example, Dr. Bullard wanted another female advisor that was his subordinate employee, Jessica Brynes, and whom he was having an inappropriate personal relationship with to have the position to which I was appointed. Dr. Bullard and Ms. Brynes would leave the office together every day. Dr. Bullard trained Ms. Brynes on procedures that I was supposed to be trained on. When I asked him for the training, he said he was too busy. In addition, Dr. Bullard was very intimidating as he would posture himself in a way that was intimidating when he was giving me instruction on assignments. He put his feet on my desk and his size and tone of voice were very demanding. In and about August 20, 2014, Dr. Bullard began yelling at me and tried to reroute my assignments to Ms. Brynes. He demanded impossible tasks to make me fail and to look bad to Dr. Zilouchian. I tried to do what he said as I was afraid of him.

3. After August 20, 2014, Dr. Bullard then began ignoring me completely by not talking to me at all and not including me in my work and meetings. He told me to go through his assistant, Teresa Perez for everything.

4. On September 10, 2014, I complained to Lynn Asseff, Director of Operations of Engineering and Computer Science that I felt Dr. Bullard was treating me disparately and harassing me.

**(See additional sheets attached)**

| ☒ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements)<br><br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct\\ | SIGNATURE OF COMPLAINANT |
| Date 4/3/15    Charging Party Signature *Chanda Michaela* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Month, day and year)*<br><br>BEVERLY IRIS SCHOCKET<br>MY COMMISSION # FF 159868<br>EXPIRES: September 15, 2018<br>Bonded Thru Notary Public Underwriters |

EXHIBIT A

**Chanda Michaela Brown v. FAU**
**Charge of Discrimination**
**Page 2**

She advised me that Dr. Bullard had previous complaints against him and that she thought administration had spoken to him. She also confirmed that Dr. Bullard was in a relationship with Ms. Brynes, his subordinate employee. Ms. Asseff indicated that she would report my complaints to Dr. Zilouchian and Dean Mohammad Ilyas.

4. Shortly, thereafter, I met with Dean Ilyas and Dr. Zilouchian and reported the discrimination and harassment. He also interviewed another female advisor, Stephanie Gordon, who had previously reported Dr. Bullard for sexual harassment. Ms. Gordon received an unfavorable job evaluation from Dr. Bullard after she complained. As of September 17, 2014, Dean Ilyas had not yet taken any action to make Dr. Bullard cease his behavior. I emailed Dean Ilyas and asked him to help me. Around September 20 or September 24, Dr. Zilouchian told me that I would report directly to him rather than Dr. Bullard.

5. Even though I no longer reported directly to Dr. Bullard, he found ways to intimidate, harass and retaliate against me after I made the complaints noted above. He would not provide physical space for my mentors to tutor students; he refused to provide assistance to a student simply because he had an appointment with me as his advisor; he refused to let me attend a meeting by conference call and told Dr. Zilouchian that I was violating FERPA by not being physical present; and he tried to put me in a negative light with Dr. Zilouchian by intimating that I might not be going to college fairs and outreach days when I was out of the office.

6. On November 18, 2014, I spoke with Dr. Zilouchian and informed him that I was still being harassed and retaliated against by Dr. Bullard by his actions mentioned in paragraph 6. At that time, Dr. Zilouchian admitted that he had not spoken to Dr. Bullard about his behavior and stated that I was the problem.

7. After this conversation, in or about December 3 or December 8, I complained again to Ms. Asseff. I was so upset and emotionally distraught that I was continuing to be treated this way by Dr. Bullard. At that time, I also asked Ms. Asseff how to apply for a medical leave as I needed to have a medical procedure that would render me out of work for approximately two to three weeks. Ms. Asseff refered me to an HR representative regarding my medical leave and she said that she would also be talking to Dr. Zilouchian and Dean Ilyas about Dr. Bullard's conduct.

8. On December 9, 2014, Dr. Zilouchian had a meeting with the advisors including me. During this meeting, I told him that Dr. Zilouchian was a bully and that all the women in the department were afraid of him except for Ms. Brynes. Another female advisor, Jessica Hibberd spoke up in the meeting and suggested that the female advisors be allowed to send "anonymous letters" to Dr. Zilouchian if they did not feel comfortable openly discussing their issues with Dr. Bullard's behavior. However, Dr. Zilouchian became angry and told us that he was not going to "tolerate any accusations against Dr. Bullard." He said he and Dean Ilyas would meet the advisors separately.

9. On the same day, Dr. Bullard was still being hostile to me. He told me that a CAPTURE meeting being held that day was "not for me" even though I was the representative of the CAPTURE project.

10. On December 10, 2014, I decided to go to Human Resources to make a complaint and met with Donna Newman, HR Manager. I repeated my experiences with Dr. Bullard to her. However, while we were meeting, Robin Kabat, Associate Director of Human Resources was meeting with Dr. Zilouchian and Dean Ilyas. I then went to my meeting with Dean Ilyas even though I was afraid to do so.

EXHIBIT A

Chanda Michaela Brown v. FAU
**Charge of Discrimination**
Page 3

I told them during the meeting that Dr. Bullard was still behaving the same way towards me. I also asked how they could continue to let him abuse women. The meeting ended with the agreement that I would go to Human Resources and discuss the issues.

11. On that same day, I requested some information from Dr. Bullard about a student's scholarship application. He refused to assist me and closed his office door literally in my face.

12. Shortly thereafter, I did have my meeting with Ms. Newman and reported the latest incident with Dr. Bullard. I also provided her a report of all the harassment and intimidation at a later date and I asked to be moved to another floor. She said she would look at the report when she could and advised me to contact FAU's Employee Assistance Program.

13. On December 18, 2014, Dean Ilyas told the advisors that his assessment of the department would be shared after the holidays. However, he never really followed through to my knowledge. Rather, Sylvanna Fahenstock told me on January 6, 2015 that Dr. Zilouchian did not want me included in any CAPTURE meetings going forward.

14. On January 7, 2015, Dr. Zilouchian asked me for my completed scholarship applications and I told him that I would give them to him the next day, as I needed clarification on two students' applications. On January 8, 2015, I learned that Ms. Brynes was doing CAPTURE advisor work. When I went into Dr. Zilouchian's office to give him the scholarship applications, Ms. Kabat was there. Dr. Zilouchian began making allegations of performance issues against me even though no one had previously told me that I had done anything wrong. I began crying and was very overwhelmed and emotionally upset. Ms. Kabat was very harsh to me and did not act neutrally. She told me to "be quiet." The meeting ended with Dr. Zilouchian asking me to electronically send him the scholarship applications. Ms. Gordon offered to assist me scan the applications because I was so upset and another employee, Jessica Lewis, offered to drive me home. Even though I had just scanned and sent the applications to Dr. Zilouchian and Ms. Kabat, Dr. Zilouchian incredulously sent me another email requesting the applications.

15. On Friday, January 9, I went to work and submitted a summary of my work to Dr. Zilouchian as he had requested the previous day. However, I had to leave work and go to the emergency room because I was having an anxiety or panic attack. On that same day, I emailed Ms. Kabat's boss, David Tomiano as I felt Ms. Kabat as well as Dr. Zilouchian were retaliating against me because of my complaints. No one had yet investigated anything or taken any action with Dr. Bullard. Mr. Tomiano did not respond, so on January 19th, I once again contacted his office but he still did not contact me or respond in any way.

16. On Monday, January 12, I saw my physician who put me on leave for 2 days for anxiety. I returned to work from January 15 to January 20, but my duties were essentially stripped from me. I saw my doctor again on January 19 and January 21. I had to take a second medical leave for anxiety from January 21 to January 26, 2015.

17. Prior to my medical leaves, on January 11, I contacted Paula Behul, Chair of FAU's Council on Equal Opportunity & Diversity to make yet another complaint about Dr. Bullard and the retaliation from Dr. Bullard, Dr. Zilouchian and Ms. Kabat as well and to request an accommodation for my anxiety and my ADHD learning disability. On January 13, I met with Ms. Behul and Ed Rowe of the Office on Disabilities. Ms. Behul provided all the forms I needed and said that I would be protected from retaliation and said she would try to find me another job out of the department. Mr. Rowe and Ms. Behul told me that I was entitled to receive ADA accommodations for work at FAU. On January 15,

EXHIBIT A

**Chanda Michaela Brown v. FAU**
**Charge of Discrimination**
**Page 4**

I submitted my ADA request for accommodation and my FAU discrimination complaint form.  Ms. Behul never did anything with either of my request or my complaint to my knowledge.

18. Subsequent to my request for accommodation and my submission of the complaint to Ms. Behul, Dr. Zilouchian requested a meeting with me on January 16.  However, based on meeting between Ms. Behul, Mr. Rowe and Ms. Kabat, I was told I did not need to attend that meeting. On January 16, Dr. Zilouchian asked to schedule another meeting with me on January 20 but refused to tell me what it was about.

19. On January 21, 2015, while I was on medical leave, Dean Ilyas sent a letter to me terminating my employment but allowing me one-month notice period to work from home on assignments FAU would give me until February 20, 2015.  I did not receive this letter until January 23, 2015 because it was sent to the wrong address.   To my knowledge, no one at FAU investigated my complaints; took any action against Dr. Bullard; or took any action about my request for accommodation.

20. For the foregoing reasons, I believe that I have been discriminated against on the basis of my gender and my disability and have been retaliated against for making complaints of discrimination all in violation of Title VII, as amended, the Americans with Disabilities Act, as amended and the Florida Civil Rights Act, as amended.



U.S. Department of Justice
Civil Rights Division

CERTIFIED MAIL
7010 0290 0000 2017 0339

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4239*
*Washington, DC 20530*

February 04, 2016

Ms. Chanda M. Brown
c/o Erika Deutsch Rotbart, Esquire
Law Offices of Deutsch Rotbart & Assocs.
4755 Technology Way
Suite 106
Boca Raton, FL  33431

Re: EEOC Charge Against Florida Atlantic University
    No. 510201502786

Dear Ms. Brown:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action against the above-named respondent under:  Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12111, et seq., and,  Title V, Section 503 of the Act, 42 U.S.C. 12203.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC Miami District Office, Miami, FL.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious..

Sincerely,

Vanita Gupta
Principal Deputy Assistant Attorney General
Civil Rights Division

by  *Karen L. Ferguson*
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: Miami District Office, EEOC
    Florida Atlantic University

EXHIBIT B



U.S. Department of Justice
Civil Rights Division

---

CERTIFIED MAIL
7010 0290 0000 2017 0339

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4239*
*Washington, DC 20530*

February 04, 2016

Ms. Chanda M. Brown
c/o Erika Deutsch Rotbart, Esquire
Law Offices of Deutsch Rotbart & Assocs.
4755 Technology Way
Suite 106
Boca Raton, FL  33431

Re:  EEOC Charge Against Florida Atlantic University
     No. 510201502786

Dear Ms. Brown:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC Miami District Office, Miami, FL.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Vanita Gupta
Principal Deputy Assistant Attorney General
Civil Rights Division

by *Karen L. Ferguson*
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: Miami District Office, EEOC
    Florida Atlantic University

EXHIBIT B