## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO: 16-cv-80251-MIDDLEBROOKS/BRANNON

CHANDA MICHAELA BROWN,

      Plaintiff,

v.

FLORIDA ATLANTIC UNIVERSITY,
BOARD OF TRUSTEES,

      Defendant.

_____/

### ORDER AND OPINION GRANTING IN PART AND DENYING IN PART
### DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court on Defendant Florida Atlantic University, Board of

Trustees' ("FAU") Amended Motion for Summary Judgment ("Motion"), filed August 18, 2016.

(DE 184).  Plaintiff Chanda Michaela Brown ("Brown") filed a Response on September 6, 2016

(DE 206), to which FAU replied on September 13, 2016 (DE 213).  For the reasons stated below,

FAU's Amended Motion is granted in part and denied in part.

### I.      Background

On July 11, 2014, FAU offered Brown the position of Coordinator, Academic Support

Services, in the Advising Department of the University's College of Engineering & Computer

Science ("ECS College"), located in Boca Raton.  (DSOF ¶ 1).[1]  The Coordinator position[2] was

created specifically to facilitate FAU's Computer Accelerated Pipeline to Unlock Regional

---

[1] Pursuant to Local Rule 56.1(a), FAU included a Statement of Material Facts within its Motion.
Brown filed a Statement of Material Facts in Dispute in opposition.  (DE 207).  Except where
Brown introduces additional facts or disputes those raised by FAU, the Court will refer solely to
FAU's Statement, which is styled "DSOF."  Brown's Statement in Dispute, where referenced, is
labeled "PSOF."

[2] FAU coordinators of academic programs are alternately referred to as "advisors."

Excellence ("CAPTURE") Program.  (*Id.*)  Brown began work as the CAPTURE Coordinator on July 28, 2014, (DSOF ¶ 2), and was assigned to report to Dr. Lofton Bullard ("Bullard"), who became her immediate supervisor (DSOF ¶ 3).   During Brown's employment, all of the individuals that Bullard supervised were women.  (PSOF ¶ 3).  Brown alleges that within a few weeks of commencing work, Bullard began to bully and harass her.  (DSOF ¶¶ 3, 13).

The Parties agree the following occurred: (1) in August 2014, Bullard told Brown he selected her as a candidate for the CAPTURE position because he thought she was Lebanese, despite there being more qualified candidates, and that he had wanted to give the job to another FAU administrator, Jessica Brynes ("Brynes") (DSOF ¶ 13; Brown Depo. 186:6-10); (2) also in August 2014, Bullard began to sarcastically refer to Brown as "the face of CAPTURE" whenever she would request his assistance (DSOF ¶ 13; Brown Depo. 186:11-19); (3) during Brown's second week at FAU, Bullard said to Brown, "I see you wearing some lipstick today, huh?", which made her feel uncomfortable (PSOF ¶ 21; Brown Depo. 217:6-22, 219:14-22); (4) Bullard put his feet on Brown's desk while in a meeting with her in her office[3] (DSOF ¶ 13; Brown Depo. 219:23-220:3); (5) on August 20, 2014, Bullard barged into Brown's office, stood over her in close quarters, and yelled at her (DSOF ¶ 13; Brown Depo. 195:4-5); (6); that same day, Bullard, by email, directed Brown to draft a report but subsequently gave that assignment to Brynes to complete (DSOF ¶ 13; Brown dep. 176:16-22, 177:3-6, 179:8-20); (7) between August 20 and September 2, 2014, Bullard began opening Brown's office after hours to leave assignments for her (DSOF ¶ 13; Brown Depo. 195:18-196:1); and (8) during that same time, Bullard stopped speaking to Brown, relayed all job tasks through another employee, Teresa Perez ("Perez"), and

---

[3] FAU contends that Bullard often needed to put his feet on desks to help with his circulation, and that he engaged in this practice when interacting with other FAU staff.  (DE 184 at 11).  Brown challenges the medical justification for this habit (PSOF ¶ 21), but does not rebut Ilyas' testimony that Bullard did it in meetings with Ilyas, a male, as well.  (DE 184 at 11; Ilyas Depo. 44:15-21).

directed Brown to speak to Perez about any assignment questions (DSOF ¶ 13; Brown Depo. 198:13-23). During this time, one of Brown's co-workers, Jessica Hibberd ("Hibberd"), informed Brown that Bullard had been loud and abrasive before Brown's arrival and related a story about Bullard making another advisor cry by slamming a door in her face.[4] (PSOF ¶ 22; Hibberd Depo. 14:22-15:19; Brown Depo. Ex. 17 at 5). Soon after she started, Brown also became convinced that Bullard and Brynes were "personally" or "romantically" involved with one another, and saw this as the explanation for Bullard's perceived favoritism towards Brynes. (PSOF ¶ 21; Compl. at ¶ 10; Brown Depo. 233:20-25-234:4).

On September 10, 2014, Brown had a meeting with Lynn Asseff ("Asseff"), the ECS College's Director of Operations, wherein she communicated some, if not all, of the above episodes and impressions. (DSOF ¶ 3). The next day, September 11, 2014, Brown met with Bullard's supervisor, Dr. Ali Zilouchian ("Zilouchian"), and the Dean of ECS College, Dr. Mohammad Ilyas ("Ilyas"), where she reiterated her grievances against Bullard. (DSOF ¶ 3; PSOF ¶ 3). Subsequently, Ilyas and Zilouchian each met with Bullard to discuss Brown's allegations. (PSOF ¶ 3).

Having been made aware of Brown's complaints, Bullard, according to Brown, started a campaign of retaliation against her by: (1) loudly requesting a hug from Brown in a public setting (PSOF ¶ 21; Brown Depo. 272:1-8); (2) joking in front of Brown and another employee that he was being moved to another floor and would not need his office any more (Brown Depo. 279:10-18); (3) making "distorted faces" directed at Brown (PSOF ¶ 4; Brown Depo. 279:19); and (4)

---

[4] In her Response, Brown delves into some detail about the relationship between Bullard and other advisors before Brown began working at FAU. Since the Court's inquiry is focused only on Brown's knowledge at the time she lodged her internal complaints, I will address those earlier events only to the extent Brown raises a factual inference that she was aware of them during her employment at FAU.

hampering Brown's passage by walking in the middle of the hallway when he walked by (PSOF ¶ 4; Brown Depo. 279:20-22).  In response, Brown emailed Ilyas on September 17, 2014, pleading for him to "please help" her because Bullard was now creating "an increased atmosphere of anxiety, bullying, rudeness and intimidation; sprinkled with his jokes."  (Ilyas Depo. Ex. 12; PSOF ¶ 3).  Ilyas responded that he was still gathering information and weighing options.  (Ilyas Depo. Ex. 12).  Around this time, another one of Brown's co-workers, Stephanie Gordon-Waldorf ("Gordon-Waldorf"), told Brown that before Brown arrived at FAU, she had accused Bullard of sexual harassment and believed that Bullard had retaliated against her by giving her an unfavorable performance review.[5]  (PSOF ¶ 22).  On September 28, 2014, based on Brown's email and the earlier consultation, Ilyas reassigned Brown to report to Zilouchian so that she no longer had to work directly with Bullard.  (DSOF ¶ 3).

Brown insists that despite the alteration of her reporting structure, Bullard continued to find ways to retaliate against her.  On October 30, 2014, Brown learned that Bullard refused to assist one of her students while she was absent.  (DSOF ¶ 14; Brown Dep. 273:16-275:14).  On November 5, Bullard, Brown, and Brynes attended an open house event where Brynes identified herself as the CAPTURE representative to prospective students and Bullard did not correct that representation.  (DSOF ¶ 14; Brown Depo. 275:15-276:18).  On November 10, Bullard refused to let Brown appear on a conference call.  (DSOF ¶ 14).  On November 12, Hibberd confided to Brown that she overheard a conversation between Bullard and Zilouchian in which Bullard

---

[5] FAU filed Paula Behul's Affidavit in support of its Reply.  (DE 211-1).  Brown moved to strike her affidavit.  (DE 216).  In her Affidavit, Behul addresses FAU's investigation of Gordon-Waldorf's accusations.  As discussed *infra*, even crediting Behul's findings as complete, the contents of Gordon-Waldorf's allegations against Bullard do not lift Brown above the necessary threshold for demonstrating a reasonable belief that she experienced a hostile work environment or retaliation.  Accordingly, because Behul's Affidavit is not material to my ruling, I deny Brown's Motion to Strike (DE 216) as moot.

questioned whether Brown really went to the sites where she was supposed to be performing off-campus duties. Bullard also suggested to Zilouchian that Brown should not be involved in CAPTURE conference calls.[6] (DSOF ¶ 14; PSOF ¶ 4; Hibberd Depo. 24:4-23).

On November 18, Brown addressed Bullard's alleged remarks at a meeting of advisors headed by Dr. Zilouchian. There, she defended her off-campus activities and criticized Bullard. (DSOF ¶ 4; PSOF ¶ 4; Brown Depo. 228:23-229:23).

On December 5, 2014, Brown met again with Asseff. (DSOF ¶ 5). At that meeting, Brown complained that Bullard was "retaliating" against her and that the situation in her department had not improved since September. (PSOF ¶ 5). Asseff immediately contacted Paula Behul, FAU's Director of the Equal Opportunity Programs Office ("EOP"). (PSOF ¶ 5; Asseff Depo. 41:20-42:17, 49:15-18, 87:16-88:11, 89:8-17; Behul Depo. 179:5-11). Asseff testified that she also contacted Ilyas and Zilouchian some time between December 5 and 8 and "told them everything that [Brown] had reported to [her]." (Asseff Depo. 89:9-12, 87:3-15; PSOF ¶ 5).

On December 9, 2014, Zilouchian held an advisor meeting at which both Brown and Bullard were present. (DSOF ¶ 6). When Zilouchian asked for recommendations to improve the office environment, Brown answered that the solution was to confront the "elephant in the room," which was the fact that Bullard was a "bully." (DSOF ¶ 6; PSOF ¶ 6). She also suggested that another person take his place. (DSOF ¶ 6). Zilouchian responded that he would not tolerate any more complaints against Bullard. (PSOF ¶ 6).

---

[6] Brown also cites to an instance where Gordon-Waldorf witnessed Bullard directing Perez to assign Brown tasks with certain deadlines so that he could "catch" her submitting work late and prove that she could not adequately perform her job. (PSOF ¶ 4; Gordon-Waldorf Depo. 40:22-41:1, 85:19-86:3). There is no evidence as to when this occurred, or that Brown even knew about it during her employment.

Thereafter, Ilyas interviewed each advisor individually (DSOF ¶ 15) about any concerns with Bullard (PSOF ¶ 6). Brown met with Ilyas on December 12, 2014. (PSOF ¶ 6). During that conversation, she expressed her dissatisfaction with Ilyas' failure to curb Bullard's perceived abuses. (*Id.*). Brown then met with an HR officer, Donna Newman ("Newman"), who then discussed the meeting with her supervisor, Robin Kabat ("Kabat"), Associate Director of Human Resources. (PSOF ¶ 5).

On December 18, 2014, Ilyas emailed the Advising Department to explain that, having completed the interviews, he would assess the situation and share his evaluation after the holidays. (DSOF ¶ 15). However, having decided that all of the advisors' concerns related to either personal gripes or Bullard's management style, Ilyas ultimately chose not disclose his findings to the department staff or to the EOP office. (DSOF ¶ 15; PSOF ¶ 6).

Between December 2014 and January 2015, Brown cites to two more examples of retaliation. On December 10, the day after the contentious advisor meeting, Bullard slammed his office door in Brown's face when she approached him to ask a question. (PSOF ¶ 5; Newman Depo. 39:15-20). And on January 6, 2015, she was excluded from a "stakeholder meeting," which she had regularly attended up to that point. (PSOF ¶ 7).

On January 8, 2015, Zilouchian requested that Brown meet with him. (DSOF ¶ 7). During the meeting, Zilouchian discussed Brown's complaints and told her "there will be no more complaints against Bullard." (PSOF ¶ 8). The meeting was heated, and Brown was crying and emotional at certain points. (PSOF ¶ 8; Brown Depo. 209:2; Kabat Depo. 64:3-7, 68:24; Zilouchian Depo. 136:20-21).

At some point in the meeting, Brown repeatedly used the term "haram" when responding to Zilouchian. (DSOF ¶ 8; PSOF ¶ 8).[7] "Haram" is an Arabic word that denotes things that are ritually forbidden under Islamic law. (DSOF ¶ 9). Zilouchian is originally from Iran (*Id.* at ¶ 8), and, Defendant implies, is Muslim. (*Id.* at ¶ 9). The Parties thus debate whether Brown, who speaks some Arabic (*Id.* at ¶ 8), used the term to convey a religious or ethnic slur. (DSOF ¶ 9; PSOF ¶ 9). Brown insists that she only meant "shame on you" for allowing Bullard to continue to retaliate against her and discriminate against the advisors. (PSOF ¶ 9).

After the January 8 meeting, FAU officials began to contemplate firing Brown. (DSOF ¶ 11). At some indeterminate point, Zilouchian recommended to Ilyas that Brown be discharged based on her "extremely unprofessional, rude and insubordinate behavior." (DSOF ¶ 11). Between January 13 and 15, 2015, a meeting was held in which Ilyas, Behul, Zilouchian, Kabat, and FAU's legal counsel were present and Brown was discussed. (*Id.*). On January 14, 2015, Kabat emailed Zilouchian a document entitled "Brown Michaela Separation Notice," (Kabat Depo. Ex. 9), which, according to FAU, was to terminate Brown for her "extremely unprofessional, rude and insubordinate behavior" at the January 8 meetin. (DSOF ¶ 12). On

---

[7] At some points in Brown's deposition, the word "haram" is incorrectly transcribed as "harangue" or "wrong." Most of the errors are in questions posed by FAU's counsel to Brown. FAU's Motion to Deem Original Transcript of Brown as Corrected requests that the record be modified to reflect this error. (DE 182). Although Rule 30(e) of the Federal Rules of Civil Procedures deals with the deponent's ability to alter the transcript, Fed. R. Civ. P 30(e), I am persuaded that the standard for correcting a transcription error applies to all parties. When the proposed change does not contradict sworn testimony, but merely corrects "an error of transcription, such as dropping a 'not,'" the record may be amended. *Amlong & Amlong, P.A. v. Denny's Inc.*, 500 F.3d 1230, 1270 (11th Cir. 2006) (quoting *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000)). Here, FAU does not attempt to make substantive changes but seeks to correct a word that is unfamiliar to the English language but which was transcribed as something phonetically similar. The court reporter has replayed the relevant audio and sworn that the words spoken were "haram." (DE 180). It is also clear from context that FAU's counsel and Brown were discussing the use of the word "haram." Indeed, Brown acknowledges in her own Statement of Facts that she used the word, albeit with a different connotation. (PSOF ¶ 9). Under such circumstances, correcting the transcript is appropriate.

January 15, Kabat contacted Zilouchian to inform him that Behul advised Ilyas that they could not "proceed" with their planned "action," which was being tabled. (PSOF ¶ 12; Kabat Depo. Ex. 11). Between January 16 and 19, both Zilouchian and Kabat prepared memoranda documenting their recollection of the January 8 meeting, which they then gave to Ilyas to review.[8] (PSOF ¶ 11). There is a dispute as to when the decision to fire Brown was made, although the Parties agree it was between January 8 and 21. (PSOF ¶ 11; Ilyas Depo. 107:24-108:4). FAU mailed Brown the final Notice of Separation on January 21, 2015, signed by Ilyas, which was dated the same day (though she received it on January 23). (DSOF ¶ 12).

Also after the January 8 meeting, Brown began experiencing health issues. On January 9, 2016, Brown did not go into work. She sent an email to Zilouchian (which was forwarded to Ilyas, David Tomanio, Asseff, and then through Asseff to Kabat), informing him that she was "having heart palpitations, panic attacks and shortness of breath" and was "going to the ER." (Zilouchian Depo. Ex. 19; PSOF ¶ 11). Also on January 9, Brown emailed FAU's Associate Vice President of Human Resources, David Tomanio ("Tomanio") (PSOF ¶ 11), describing the January 8 meeting as a "retaliatory action." (*Id.*). Brown requested Tomanio's help in transferring her to another department. (*Id.*). On January 10, Brown's mother emailed Zilouchian to confirm the emergency room visit, explain that her daughter had been diagnosed with palpitations and "anxiety relative to work induced stress," and announce that Brown would not be returning to work until after January 13, 2015. (Zilouchian Depo. Ex. 20; PSOF ¶ 11). Zilouchian forwarded this email to Ilyas, Asseff, Tomanio, and Kabat, and marked his message as of "high" importance. (*Id.*).

---

[8] Ilyas and Kabat do not agree on whether Ilyas requested the memoranda from her. (PSOF ¶ 11). Ilyas could not recall whether he requested the memorandum from Zilouchian. (Ilyas Depo. 99:21-100:6).

Brown emailed Behul on January 11, requesting a meeting because she was "experiencing retaliation" for reports of "harassment and discrimination." (Behul Depo. Ex. 1; PSOF ¶ 11). Brown wrote further that she was told in the Performance Meeting to "stay quiet," was afraid of further punishment at the hands of Zilouchian and Kabat, and was having heart palpitations and panic attacks.  (Behul Depo. Ex. 1).  Behul notified Ilyas about Brown's allegations on January 12.  (Id.).  The day after that, Brown met with Behul to describe her complaints in greater detail and obtain paperwork to lodge a formal complaint.  (PSOF ¶ 11).  They also discussed the possibility of Brown receiving either a transfer or an ADA accommodation, the form for which Behul provided.[9]  (Behul Depo. 47:15-24, 51:13-23; PSOF ¶ 11).  At some point thereafter, Brown met with Ed Rowe, FAU's ADA coordinator, to receive further instruction on the ADA accommodation.   (Behul  Depo.  51:3-5;  PSOF  ¶  11).   Brown  submitted  her  formal Discrimination/Harassment Complaint Processing Form and ADA accommodation request on January 14, 2015.  (DSOF ¶ 16).  The complaint listed age, disability, and sex as the bases for discrimination.  (Brown Depo. Ex. 17 at 1).  The accommodation request recorded "ADHD, Anxiety Disorder" as Brown's impairments, though its author, ostensibly her doctor, checked the "No" box in response to the form's question, "Does the impairment affect a major life activity?" (Brown Depo. Ex. 18 at 1).  Below that, her physician answered the question of how Brown's "limitation" interfered with her ability to perform "job function(s)," by writing "Not over regular work hours," and "Clear & organized direction." (Id. at 2).  The specific accommodations sought were phrased as "structured, clear & precise goals & objectives." (Id.).  The day before FAU mailed Brown her separation notice, Brown emailed Zilouchian to request a meeting to discuss

---

[9] FAU also relies on Paula Behul's Affidavit (DE 211-1) in support of its argument that FAU made efforts to accommodate Brown's disability requests.  The Court need not determine whether FAU adequately accommodated her requests at this stage, in light of the disputed timing between FAU's discovery of her impairment and the date of her termination.

how to implement her proposed ADA accommodations.  (PSOF ¶ 16).  Zilouchian did not reply, but forwarded the request to Ilyas, who in turn forwarded it to Tomanio.  (PSOF ¶ 16; Zilouchian Depo. Ex. 28).

Brown filed this action on February 23, 2016.  (DE 1).  Her Complaint was amended twice thereafter (DE 24 & 44).  Brown's Second Amended Complaint states two causes of action: (1) disability discrimination under the Rehabilitation Act; and (2) retaliation under the Civil Rights Act of 1964.  (DE 44 at ¶¶ 54-66).

## II.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)(1)(A)).  Where the non-moving party bears the burden of proof on an issue at trial, the movant may simply "[point] out to the district court that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  After the movant has met its burden under Rule 56(c), the burden shifts to the non-moving party to establish that there is a genuine issue of material fact.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).

Although all reasonable inferences are to be drawn in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475

U.S. at 586. The non-moving party may not rest upon the mere allegations or denials of the adverse party's pleadings, but instead must come forward with "specific facts showing that there is a *genuine issue for trial*." *Id.* at 587 (citing Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the non-moving party fails to make a sufficient showing on an essential element of her case on which she has the burden of proof, the moving party is entitled to a judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

### III.   Discussion

#### A. Retaliation

Brown avers that FAU retaliated against her in violation of Title VII of the Civil Rights Act of 1964. (Compl. ¶ 66). The alleged retaliatory acts correspond to Brown's initial hostile environment complaints as well as her subsequent reports of retaliation in reaction to the first round of charges. (Id. at ¶¶ 62-63). Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). In order to make out a prima facie case of retaliation, a plaintiff must show that "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

1.  Protected Activity

An employee engages in protected activity when she uses her employer's internal reporting mechanism to complain about illegal employment practices carried out by the employer or its agents. *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989). The same is true of informal complaints to one's supervisors. *Id.* These activities fall within the scope of Section 20003-3(a)'s opposition clause. *Little v. United Tech.*, 103 F.3d 956, 960 (11th Cir. 1997). An internal report of a hostile work environment based on a protected classification is protected under the opposition clause, *Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015), as is a report alleging retaliation for engaging in earlier protected activity. *Shah v. Clark Atlanta Univ., Inc.*, No. 1:97-CV3786CAM, 1999 WL 1042979, at *14 (N.D. Ga. Jul. 20, 1999); *Blasingame v. General Motors Corp.*, Civil Action No. 1:05-cv-1313-GET, 2007 WL 420190, at *10 (N.D. Ga. Feb. 5, 2007).

To satisfy the protected activity prong, Brown must raise the inference that at the time she complained to supervisors, she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little*, 103 F.3d at 960. This standard entails an objective and a subjective component:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.* (emphasis in original). FAU does not question that Brown subjectively believed that Bullard established a hostile work environment because of her sex and later retaliated against her for complaining about it. It does, however, dispute whether that belief was objectively reasonable.

FAU urges that because none of the underlying complained-of incidents were independently actionable, Brown's belief that they were was unreasonable *per se*. However, in *Little*, the Eleventh Circuit stressed that a "plaintiff . . . *need not prove* the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a prima facie case and overcome a motion for summary judgment; such a requirement '[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances.'" *Id.* (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978)) (emphasis added). Whether a plaintiff's belief that the complained-of conduct was objectively reasonable is "measured against existing substantive law" of employment discrimination. *Clover v. Total Sys. Serv.*, 176 F.3d 1346, 1351 (11th Cir. 1999).

A plaintiff's belief that a certain practice is discriminatory cannot be objectively reasonable "[w]here binding precedent squarely holds that particular conduct is not . . . unlawful . . . and no decision of this [Circuit] or of the Supreme Court has called that precedent into question or undermined its reasoning." *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008). When the merits of the underlying claim are doubtful, the plaintiff must be able to point to some "statutory [language] or case law that can reasonably be believed" to support her understanding. *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 857 (11th Cir. 2010); *see also Knott v. DeKalb Cty. Sch. Sys.*, 624 F. App'x 996, 998 (11th Cir. 2015) (per curiam) (citing to *Dixon* to affirm district court's dismissal of retaliation claim that was premised on initial report of sex discrimination, which no case law could reasonably be construed to support). It may be enough to raise multiple encounters that, while insufficient to sustain an independent cause of action, together evince an environment "tinged" with a discriminatory animus. *See Howell v.*

*Correctional Med. Serv.*, 612 F. App'x 590, 591 (11th Cir. 2015) (reversing district court's dismissal of retaliation claim because "racially-tinged comments" combined with violent altercation allowed plaintiff to reasonably believe "that she was opposing an unlawful employment practice"). But one or two isolated comments cannot instill a reasonable belief. *Butler*, 536 F.3d at 1214 (conversation in which co-worker twice used racial epithet "not even close" to permitting plaintiff to believe workplace environment was racially hostile). In sum, while the protected activity prong does not require Brown to *prove* that the complained-of behavior violated Title VII, I must still analyze whether Brown *reasonably believed* that it did violate Title VII.

Brown maintains that there was a reasonable basis for her to conclude that two of Bullard's activities were unlawful. One was a series of interactions that Brown characterizes as creating a sex-based hostile work environment. The other was Bullard's acts of retaliation for Brown's original complaints of the hostile work environment. I will consider each in turn.

**a. Hostile Work Environment:** To sustain the position that she made protected complaints about a sex-based hostile work environment, Brown contends she engaged in protected activity when she complained about a sex-based hostile work environment during (1) her September 2014 meetings and communications with Asseff, Ilyas, and Zilouchian and (2) her December 2014 meetings with Ilyas and Newman.

To make a prima facie case of hostile work environment, a plaintiff must show "(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is

14

responsible for such environment under either a theory of vicarious or of direct liability." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

FAU contends Brown cannot show an objective basis for believing that Bullard's harassment was based on sex and was sufficiently severe or pervasive, i.e., the third and fourth *Kenworth* prongs. It urges that none of Bullard's conduct approaches sex discrimination. Brown retorts that, while almost none of the relevant interactions were sexual in nature, Bullard still treated her and her co-workers unequally, and would not have, but for their sex. Disparate and invidious treatment on the basis of sex can occur even in the absence of sexual advances. That is because the nature of the harassment may still reflect "general hostility to the presence of women in the workplace." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998) (holding that non-sexual discrimination can be evinced through abuser's "sex-specific and derogatory terms" directed at victims or his comparative treatment of both sexes in a "mixed-sex workplace"); *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1503 (11th Cir. 1985) (distinguishing between sexual harassment and harassment accomplished by "threatening, bellicose, demeaning, hostile or offensive conduct" because of victim's sex). Brown's admission that she never suffered from "sexual harassment" is not fatal to her claim that she reasonably believed Bullard had created a hostile work environment based on sex.

Brown cites to a number of acts to support her reasonable belief that she was subjected to a sex-based hostile work environment. She points to Bullard's remark that he selected Brown's resume because he believed she was Lebanese and that he preferred Brynes (also a woman) for the CAPTURE job. That remark suggests national origin discrimination (though that is not alleged) or run-of-the-mill favoritism – but not sex discrimination. The mere fact that a supervisor "play[s] favorites" among subordinates does not suggest discrimination, particularly

when an object of the supervisor's favor is within the plaintiff's own class. *See Chavez v. URS Fed. Tech. Serv., Inc.*, 504 F. App'x 819, 822 (11th Cir. 2013) (per curiam) (supervisor accused of sex discrimination "favored employees of both sexes" over plaintiff). Bullard's sarcastic "face of CAPTURE" label for Brown may further point towards favoritism (in light of his failed attempt to bring Brynes in on CAPTURE work), but again says nothing about Bullard's attitude towards women. The favoritism theme continued when Bullard reassigned a report to Brynes to complete, but the same critique applies. Neither is it relevant that Brown suspected Bullard and Brynes of having some sort of romantic or personal connection. *Parker v. Otis Elevator Co.*, 9 F. App'x 615, 617 (9th Cir. 2001) (complaining about romantic relationship between supervisor and subordinate and resulting favoritism not protected because relationship not prohibited by Title VII).

Although it is possible that Bullard's habit of propping his feet up on the desks of his female subordinates during meetings could be viewed as a sign of disrespect rooted in hostility to women, there is unrebutted testimony that Bullard did the same thing in the office of one of his male superiors. (Ilyas Depo. 44:15-21). Additionally, as there were no males in the Advising Department, there is no evidence that Bullard did not prop his feet on desks of male subordinates.[10] In light of the evidence, Bullard's habit of propping his feet up is not based on Brown's sex.

That Bullard once entered Brown's office and stood close to her while he yelled shows that Bullard was an abrasive boss – not that he was a discriminatory one. *See Clark v. S. Broward*

---

[10] Brown correctly notes that she is not *required* to introduce comparator evidence to establish a prima facie retaliation claim. *Shedrick v. Dist. Bd. of Trustees of Miami-Dade Coll.*, 941 F. Supp. 2d 1348, 1370 (S.D. Fla. 2013). Nonetheless, the existence or absence of comparators may be probative in evaluating the seriousness of the underlying conduct, which the protected activity prong of the retaliation analysis must address.

*Hosp. Dist.*, 601 F. App'x 886, 899-900 (11th Cir. 2015) (without more, supervisor confronting and yelling at female subordinate is not probative of sex-based motivations); *Chavez*, 504 F. App'x at 822 (manager consistently berating female employee in front of co-workers not sex-based). The same goes for Bullard's practice of leaving work on Brown's desk overnight, being unresponsive to questions, using a proxy to route assignments, and denying space for Brown's mentors.

The lone example of sex-based conduct directed at Brown is Bullard's passing allusion to her lipstick. Because lipstick is a cosmetic product associated with women, one can reasonably conclude that Bullard's observation was based on Brown's appearance as a woman. I will discuss the import (or lack thereof) of this comment under the fourth *Kenworth* prong.

Brown also cites to the harassment accusations of other FAU employees against Bullard. It is true that "words or conduct" directed towards other members of the plaintiff's protected class, which the plaintiff overhears, witnesses, or is otherwise aware of, may provide the foundation for a hostile work environment claim. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010); *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995); *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (noting that plaintiff's second-hand knowledge of derogatory statements counts in evaluating the hostility of work environment). Critically, though, the plaintiff must actually be aware of the activity "at the relevant time at which he alleges he experienced the hostile environment." *Melton v. Nat'l Dairy LLC*, 705 F. Supp. 2d 1303, 1341 (M.D. Ala. 2010); *see also Gonzalez v. Fla. Dep't of Highway Safety and Motor Vehicles*, 237 F. Supp. 2d 1338, 1350 (S.D. Fla. 2002) (granting summary judgment on hostile work environment claim where plaintiff did not make clear "how and when he learned of" offensive comments).

Several of the incidents to which Brown refers[11] occurred prior to her starting work and she does not attempt to prove that she was cognizant of these while employed by FAU. The only second-hand information that Brown demonstrates she knew about before lodging her own complaints were (1) Gordon-Waldorf's report of sexual harassment and suspicion of subsequent retaliation and (2) Hibberd's general characterization of Bullard as loud, plus a specific story about Bullard slamming the door in another advisor's face. For the reasons discussed above, the information acquired from Hibberd does not move the needle in raising an inference that Bullard's behavior was sex-based. And although Gordon-Waldorf's disclosure may have genuinely colored Brown's perception of Bullard's actions, Gordon-Waldorf testified that the conduct which motivated her complaint had ceased prior to Brown's arrival. (Gordon-Waldorf Depo. 23:20-23). The events having passed, they could not have contributed to an objective assessment of ongoing hostility towards women.

Additionally, the cited incidents and behavior do not come close to satisfying the fourth *Kenworth* element, which requires a showing that the harassment was severe or pervasive. *Kenworth*, 277 F.3d at 1275; *Reeves*, 594 F.3d at 808 (emphasizing the disjunctive nature of these terms). Courts, in evaluating the factor, must consider whether the alleged conduct is "physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Innocuous statements" do not count. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Furthermore, the evidence is considered "cumulatively and in the totality of the

---

[11] In particular, Hibberd's recounting that Bullard imitated her voice; Dr. Tom Fernandez's allegation that Bullard made a racist comment; and the fact and circumstances under which the Advising Department underwent sexual harassment training.

circumstances." *Reeves*, 594 F.3d at 808.   The significance of any offending words is judged according to the context in which the words were spoken. *Id.* at 810.

Under this standard, Bullard's observation that Brown was wearing lipstick is clearly innocuous, even if it made her uncomfortable.   It also happened only once.   Moreover, even the more boorish remarks and requests for hugs and kisses related by Gordon-Waldorf fall well shy of showing a pattern of humiliation that interfered with work performance.   Indeed, the Eleventh Circuit has consistently rejected hostile work environment claims based on more disturbing conduct. *See, e.g., Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247-48 (11th Cir. 1999) (affirming summary judgment for employer where supervisor told female subordinate "I'm getting fired up," rubbed his hip against her while touching her shoulder and smiling, twice made sniffing sounds while looking at her groin area, and constantly followed her and stared at her); *Gupta*, 212 F.3d at 584-85 (reversing district court and entering summary judgment for employer where co-worker frequently called female employee at night to ask personal questions, continually asked her to lunch, stared at her, had his shirt off in her presence, touched her knee, bracelet, ring, and dress hem, and called her beautiful); *Mitchell v. Pope*, 189 F. App'x 911, 913-14 (11th Cir. 2006) (per curiam) (affirming summary judgment in employer's favor where supervisor made "offensive utterances" towards female subordinate, tried to kiss her, lifted her over his head, rubbed up against her and reached across her chest).

Of course, Brown need not perfect a hostile work environment claim in order to show that she reasonably thought she had been subjected to a hostile work environment at the time she opposed the conduct.   She must only show that the behavior was "close enough." *Clover*, 176 F.3d at 1351.   But even under this more permissive criterion, the evidence marshalled is inadequate.   The lion's share of the underlying conduct, which relates to perceived unfair

treatment, is not just insufficient in degree, but outside Title VII's purview.   A hostile environment claim premised on such categorically different acts would run into "binding precedent" – namely, *Kenworth* and its progeny – "squarely hold[ing] that [the] particular conduct is not an unlawful employment practice." *Butler*, 536 F.3d at 1214; *see also Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) ("[u]nfair treatment" by itself cannot provided the basis for protected activity).[12]

The single example that survives the "based-on" inquiry is so far from meeting the "severe or pervasive" threshold that it does not even reach the level of scattered offensive remarks that were themselves deemed well below the mark in other cases. *See, e.g., Butler*, 536 F.3d at 1214 (involving two racial epithets).   Moreover, the cases that Brown cites are easily distinguishable and cannot reasonably be construed to support her interpretation of sex discrimination.[13]   For these reasons, Brown fails to raise the inference that it was reasonable for

---

[12] The Eleventh Circuit has consistently rejected attempts to satisfy the protected activity prong on this theory. *See, e.g., Knott*, 624 F. App'x at 998 (allegations that supervisor engaged in excessive monitoring, failed to assist plaintiff, called conference without consulting her, and referred her to job support programs did not support objective reasonableness of gender discrimination complaint); *Birdyshaw v. Dillard's Inc.*, 308 F. App'x 431, 436-37 (11th Cir. 2009) (per curiam) (letter describing manager's "harsh treatment . . . in connection with a work-related dispute" was not protected opposition to sex discrimination).

[13] In *Bell v. Crackin Good Bakers*, the Eleventh Circuit placed great weight on comparator evidence, finding it significant that the plaintiff, who was relentlessly belittled by her supervisor, was the only woman holding a certain high-level position, while several men in similar positions were treated respectfully. *Bell*, 777 F.2d at 1502. It also relied on the facts that no woman had ever held the plaintiff's position at the plant before and that her supervisor had stated "he would try to run her off if he could." *Id.* Here, the specific context of a supervisor admitting a design to remove a woman from an unprecedented position of authority is absent. Moreover Brown cannot offer comparator evidence because Bullard supervised only women. Her invocation of *Williams v. Marriott*, 864 F. Supp. 1168 (M.D. Fla. 1994), fails for the same reason. *Smith v. City of New Smyrna Beach* involved a female firefighter in a male-dominated setting, who was subject to explicit denigrations of women's capabilities, loss of privileges over her pregnancy, and official policies prohibiting "girl magazines" and tampons. 588 F. App'x at 979-80. Nothing of that sort took place here.

her to believe she suffered from a hostile work environment based on sex discrimination at the time she complained to her superiors.

One final issue bears addressing. Brown implicitly raises an alternative argument to rescue her position that the sex discrimination complaints were protected. She introduces the proposition that, when lodging an internal complaint, a Title VII plaintiff need not employ "magic words," such as discrimination. It is enough if the figure to whom the conduct is reported can reasonably infer an allegation of unlawful discrimination from the facts of the complaint. Brown also thinks it salient that, in considering those facts, the FAU figures to whom she spoke would have been aware of other circumstances that Brown did not discuss but which might have contributed to their making an inference of sex discrimination. Similarly, Brown urges that Behul's post-termination conclusion that she engaged in protected conduct supports a reasonable belief that her underlying complaints were protected.

No published opinion in this Circuit has held that the protected activity prong is satisfied solely when the plaintiff conveys enough information for her employer to understand that discrimination has been alleged – though some courts have so implied, *see, e.g.*, *Murphy*, 383 F. App'x at 918; *Reynolds v. Golden Corral Corp.*, 106 F. Supp. 2d 1243, 1253-54 (M.D. Ala. 1999). In a footnote in an unpublished decision, the Eleventh Circuit agreed that "[t]here is no magic word requirement" and that the label a plaintiff puts to her experiences will not determine whether the employer is "on notice of the offending behavior." *Olson v. Lowe's Home Ctr. Inc.*, 130 F. App'x 380, 391, n.22 (11th Cir. 2005). Even accepting these principles, there is no authority for Brown's proposed corollary – that unstated circumstances of which the employer is aware must be weighed in deciding whether one could make a reasonable inference of discrimination.

More to the point, how an employee frames her allegations or how the employer subjectively perceives them is not the determinative issue when examining protected activity. Although the Third Circuit has endorsed the so-called "perception theory",[14] *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 565 (3d. Cir. 2002), this Circuit has declined to adopt it as yet. *Carter v. Columbia Cty.*, 597 F. App'x 574, 580 (11th Cir. 2014) (per curiam). It is true that demonstrating employer notice is an independent requirement under the causality prong of a prima facie case. *Higdon v. Jackson v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). But to show protected activity, a plaintiff must still adduce facts that are objectively "close enough" to what would be the basis of a successful discrimination claim. *Clover*, 176 F.3d at 1351. Accordingly, Brown cannot circumvent the objective component of the "good faith, reasonable belief" test by speculating on the thought processes of FAU administrators.

**b. Retaliation:** Brown also alleges that she reasonably believed Bullard retaliated against her after he was made aware of her original complaints. Because the objective reasonableness of this belief is tied to substantive law, Brown must come somewhat close to proving that: (1) she had previously engaged in a protected activity; (2) Bullard thereafter took steps to adversely and materially impact the terms and conditions of her employment; and (3) the original protected activity and subsequent adverse actions were causally connected. *Crawford*, 529 F.3d at 970.

Theoretically, "a complaint about retaliation for a protected activity [may] itself be a protected activity." *Shah*, 1999 WL 1042979, at *14. But whether it is so in practice should logically depend on whether the antecedent activity was actually protected. As to the antecedent activity, I have already determined that the hostile work environment charges were unprotected.

---

[14] According to the perception theory, an employer's mistaken belief that a plaintiff engaged in protected activity may substitute for an objective determination that she did so. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 565 (3d. Cir. 2002).

However, even assuming I could consider Brown's allegations of retaliation for complaining about a hostile work environment in a vacuum, Brown's claim still fails. That is because she cannot show (1) that it was objectively reasonable for her to believe that Bullard inflicted an adverse employment action upon her after she made her original reports; and (2) that it was reasonable for her to draw a causal connection between the antecedent complaint and the perceived adverse action. *Blasingame*, 2007 WL 420190, at *10, n.11.

As to the first requirement, Brown has suggested that a series of events created a retaliatory hostile work environment, which the Eleventh Circuit recognized in *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012) (per curiam).[15]  In response to her September 2014 meetings with Asseff, Ilyas, and Zilouchian, Brown claims that Bullard (1) loudly requested a hug from her in front of other people; (2) made a joke to her and a co-advisor musing about the repercussions he would face for her recent complaints; (3) made distorted faces at her; and (4) deliberately walked in the middle of the hallway to hinder her passage.  These reactions are not even in the same ballpark as the conduct in *Gowski*.[16]  Here, Bullard's pre-transfer behavior manifests nothing more than "petty and trivial" slights.  *Harris v. Fla. Agency for Health Care Admin.*, 611 F. App'x 949, 953 (11th Cir. 2015) (per curiam) (importing the concept of triviality from the traditional retaliation context to *Gowski* claims).

Most of Bullard's actions after Brown was reassigned to Zilouchian are in the same vein: refusing to help a student assigned to Brown in her absence; not correcting Brynes when she

---

[15] *Gowski* incorporated the factors that courts already consider in evaluating traditional hostile work environment claims. *Swindle v. Jefferson Cty. Comm'n*, 593 F. App'x 919, 929 (11th Cir. 2014) (per curiam).

[16] *Gowski* involved a targeted campaign over years to spread rumors against the plaintiffs, solicit negative reports of their performance, instruct other employees to encourage their resignation, restrict their privileges, remove them from committees and projects, ban them from conducting research, reassign their positions, and give them poor evaluations. *Gowski*, 682 F.3d at 1313-14.

identified herself as the CAPTURE representative; not permitting Brown to participate in a conference call; slamming his door in Brown's face; and excluding Brown from a "stakeholder meeting."[17]   These incidents fall firmly within the realm of daily workplace tribulations and cannot reasonably be believed to establish the source of a retaliatory hostile environment claim.

Brown also cites to Hibberd's disclosure (over which there is a factual dispute) that she overheard Bullard casting doubt on Brown's whereabouts to Zilouchian.  This is akin, if not quite identical, to the rumors that the administration in *Gowksi* spread to damage the reputation of complaining doctors.  *Gowski*, 682 F.3d at 1313.  Yet one pernicious rumor, even if accurately relayed to Brown, does not meet – or come close to – the requisite level of severity.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988) (isolated incidents must be "extremely serious" to change the "terms and conditions of employment"); *Webb-Edwards v. Orange Cty. Sheriff's Office*, 525 F.3d 1013, 1028 (11th Cir. 2008) (quoting *Faragher*); *accord. Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 284 (4th Cir. 2015) (for employee to reasonably believe that single incident creates hostile work environment, it must be "physically threatening or humiliating"); *Alfano v. Costello*, 294 F.3d 365, 374 (2d. Cir. 2002) (single incident must be "extraordinarily severe"); *see also Rodriguez v. Westbury Pub. Sch.*, No. CV 13-4976, 2015 WL 4459351, at *10-11 (E.D. N.Y. Jul. 15, 2015) (even in combination with other events, co-worker "bad-mouth[ing]" plaintiff to superior was not sufficiently severe or pervasive to alter working conditions).[18]   And though the Court recognizes that this event must be examined in context,

---

[17] This last snub occurred after Brown had already lodged her retaliation complaints, so would encounter causality problems even if deemed adverse.

[18] Brown also cites to Gordon-Waldorf's testimony that she heard Bullard directing Perez to give Brown assignments which he intended for her to be unable to complete on time, in order to "catch" Brown's performance failings.  Targeted attempts to induce subordinates' failures or undermine their work product may be adverse actions.  *See, e.g., Lewis v. Fed. Prison Indus., Inc.*, 786 F.2d 1537, 1540 (11th Cir. 1986) (accepting district court's finding that supervisor

24

*Reeves*, 594 F.3d at 808, none of the allegedly related altercations with Bullard rise above trivial workplace slights.  Since evidence of severe or pervasive hostility is absent, I do not reach the question of Brown's perception of a causal link (except as to Bullard's "sabotage" assignment, addressed in n.18).

Thus, Brown fails to adduce sufficient evidence that she engaged in protected activity when she complained to FAU officials about Bullard's retaliatory behavior.  Summary judgment is therefore granted in FAU's favor with respect to Brown's retaliation cause of action.

## B. Disability Discrimination

Through her second cause of action, Brown alleges that FAU discriminated against her on the basis of her disabilities when it terminated her employment and refused her accommodation request. (Compl. ¶¶ 58-59).  This claim arises under the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355 (codified at 29 U.S.C. § 794), because FAU is a covered entity that receives federal grants.  The same standards governing claims under the Americans with Disabilities Act (ADA) apply to claims under the Rehabilitation Act. 29 U.S.C. § 794(d); *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

To establish a prima facie ADA claim, a plaintiff must show that (1) she has a disability; (2) she is a "qualified individual," in that she is "able to perform the essential functions of [her position] with or without reasonable accommodation"; and (3) the defendant "unlawfully discriminated against [her] because of the disability." *Reed v. Heil Co.*, 206 F.3d 1055, 1061

---

harassed employee by "waiting to catch him in some mistake or moment of inactivity"). However, a causal link is missing.  Brown has presented no evidence that she was aware of Bullard's directive while employed at FAU.  Indeed, the information appears to have emerged only recently from Gordon-Waldorf's deposition testimony.  That means it was impossible for Brown to have held a subjective, good faith belief that Bullard was retaliating against her on this basis. *Edwards*, 49 F.3d at 1522 (incidents which plaintiff did not discover until after termination "could not have contributed to her subjective view of a hostile environment").

(11th Cir. 2000). Unlawful discrimination includes not just ultimate employment decisions, but also, *inter alia*, failing to make reasonable requested accommodations that do not impose an undue hardship on the employer's business operations. 42 U.S.C. § 12112(b)(5)(A); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1236 (11th Cir. 2005).

FAU argues that Brown's disability claim fails because FAU made the decision to terminate her prior to it having knowledge of her alleged disabilities. FAU contends that "Ilyas decided to separate Brown's employment at FAU after speaking to Zilouchian on January 8, 2015." (DE 213 at 2, citing Ilyas Depo. 107:3-6). However, the deposition testimony does not support FAU's position. Ilyas testified that the decision to fire FAU was a collective decision, which involved legal and human resources. (Ilyas Depo. 106:22; 107:15-18). When asked who recommended terminating Brown, Ilyas testified:

> Who, this was a collective decision because we realized the situation is really getting out of hand and based on what happened in the meeting, on January 8th, after the resolution that was - - in my opinion, that was supposed to be a meeting about something else if I recall correctly and the meeting did not go very well and we realized this situation is not sustainable and this is more kind of disruptive behavior and we needed better service to our operations and we decided to have separation.

(*Id.* at 106:21-107:6).[19] Contrary to FAU's representation, this testimony does not reflect that Ilyas made the decision to terminate Brown on January 8. And based on his description that legal and human resources were involved in that decision, it is inconceivable, at least on the record before the Court, that the decision was made on January 8, as legal and human resources had not gotten involved yet. As the decision date is disputed, and could have happened after Brown began sending emails about her health issues on January 9, FAU has not shown that it did not

---

[19] Attached hereto as Exhibit 1.

know about Brown's alleged disabilities prior to her termination. FAU's motion for summary judgment is denied on this ground.

FAU also argues that Brown does not have a disability within the meaning of the ADA. One of the ways to demonstrate a disability is to show that FAU regarded her as having a disability. 42 U.S.C. § 12102(1)(C).[20] Brown maintains that the relevant FAU administrators were aware of her anxiety impairment based on the emails they received from Brown and her mother, which they forwarded to each other (in one case designating the message as of "high" priority). Viewing the facts in the light most favorable to Brown, there is at least some evidence from which a reasonable jury could conclude that FAU perceived Brown to be impaired. Although Zilouchian, Kabat, Asseff, Ilyas, and Tomanio commented little, if at all, in their correspondence about the emails, the fact that they circulated those emails quickly and widely, and deemed them as of "high" importance, reasonably can be seen as proof of their significance. *See Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012) (per curiam) (explaining that the "regarded as" prong requires plaintiff to "demonstrate only that the employer regarded him as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity"); *Burton v. Freescale Semiconductor*, 798 F.3d 222, 230-31 (5th Cir. 2015) (manager's responding to employee email about ER visit and heart palpitations by "'immediately' instruct[ing] his staff to 'look at it' because [her medical issues] were 'important'" evidence that employer regarded plaintiff as disabled). Ilyas separately testified, when asked whether he considered Brown's anxiety while deciding whether to fire her, that he

---

[20] An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity.* 42 U.S.C. § 12102(3)(A) (emphasis added).

"had the whole situation in front of [him]." (Ilyas Depo. 100:16-22). Accordingly, summary judgment is not appropriate as to the disability prong.

Finally, FAU argues that Brown cannot show she is a qualified employee because, if it granted her accommodation requests, specifically for a "structured work environment," she would be unable to perform the "essential functions" of the Coordinator position, which "clearly required flexibility, imagination and the ability to communicate with a wide variety of people at different times and locations." (DE 184 at 20). A "qualified individual" is one who can perform the "essential functions" of the position "with *or without* reasonable accommodations." *Reed*, 206 F.3d at 1061 (emphasis added). FAU has failed to cite to evidence, or the absence of evidence, to support its argument that Brown cannot perform the essential functions of her job with or without accommodations. Indeed, FAU fails to even *address* whether Brown could perform the essential functions without accommodation.

For these reasons, FAU's motion for summary judgment as to Brown's disability claim is denied.

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that

(1) Defendant Florida Atlantic University, Board of Trustees' Amended Motion for Summary Judgment (DE 184) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to Plaintiff Chanda Michaela Brown's Title VII retaliation claim. The Motion is **DENIED** as to Plaintiff's disability discrimination claim under the Rehabilitation Act.

(2) Defendant Florida Atlantic University, Board of Trustees' Motion to Deem Original Transcript of Chanda Micaela Brown as Corrected (DE 182) is **GRANTED**. Page

214, line 1 should read as "haram" instead of "harangue."  Page 214, line 10 and Page

217, line 24 should read as "haram" instead of "harangue."

(3) Plaintiff Chanda Michaela Brown's Motion to Strike Affidavit of Paula Behul (DE

216) is **DENIED AS MOOT**.

**SO ORDERED** in Chambers at West Palm Beach, Florida, this 24 day of October,

2016.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:      Counsel of Record

Case 9:16-cv-80251-DMM   Document 229   Entered on FLSD Docket 10/24/2016   Page 30 of 31
Case 9:16-cv-80251-DMM   Document 156-1   Entered on FLSD Docket 08/04/2016   Page 106 of
146

DEAN MOHAMMAD ILYAS                                    June 03, 2016
BROWN -vs- FLORIDA ATLANTIC UNIVERSITY                        106

1      Q.   Does that refresh your recollection when

2  you received this document that is dated January 16,

3  2015?

4      A.   Let me say it again, I see this Email came

5  on the 20th, I see the document was attached, yes, I

6  received the document, I don't recall the exact

7  date.

8      Q.   Is there another document besides this one

9  that you would have received?

10      A.   I received one document, it may be this

11  one.

12      Q.   I don't have any others, that's why I am

13  asking you, so you would have received that on

14  January 20th, is that correct?

15      A.   I see the Email in front of me; based on

16  that Email, yes.

17      Q.   Who recommended terminating Ms. Brown?

18              MS. MARSHALL:  Form.

19              MS. ROTBART:  You can answer the

20  question.

21              THE WITNESS:  Who, this was a

22  collective decision because we realized the

23  situation is really getting out of hand and based on

24  what happened in the meeting, on January 8th, after

25  the resolution that was -- in my opinion, that was



DEAN MOHAMMAD ILYAS
BROWN -vs- FLORIDA ATLANTIC UNIVERSITY

June 03, 2016
107

1  supposed to be a meeting about something else if I

2  recall correctly and the meeting did not go very

3  well and we realized this situation is not

4  sustainable and this is more kind of disruptive

5  behavior and we needed better service to our

6  operations and we decided to have separation.

7  BY MS. ROTBART:

8      Q.   Who decided?

9              MS. MARSHALL:   I am going to object

10  to the extent it calls for attorney/client privilege

11  communication.

12  BY MS. ROTBART:

13      Q.   Who decided the decision to terminate

14  Ms. Brown?

15      A.   We sought advice on this kind of

16  situation, as I mentioned, legals were involved,

17  human resources were involved and this was the

18  course we decided.

19      Q.   Did Ms. Kabat make that recommendation to

20  you?

21              MS. MARSHALL:   Form.

22              MS. ROTBART:   You can answer the

23  question.

24              THE WITNESS:   Well, as I mentioned,

25  that recommendation, it was a collective decision,

